UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| ROBERT T. MARTIN, | ) |
| | ) |
|     Plaintiff, | ) |
| | ) |
| v. | )   Case No. 3:08-0418 |
| | )   Judge Echols |
| LOOMIS ARMORED US, INC. and | ) |
| JIM GILL, | ) |
| | ) |
|     Defendants. | ) |

## MEMORANDUM

Defendants Loomis Armored US, Inc. and Jim Gill ("Loomis," "Gill," and collectively "Defendants") filed a Motion For Summary Judgment (Docket Entry No. 16), to which Plaintiff Robert T. Martin ("Plaintiff") filed a response in opposition (Docket Entry No. 19) and Defendants filed a reply (Docket Entry No. 26). Also pending are Plaintiff's Motion and Memorandum to Strike the Declaration of Robert Karpinecz (Docket Entry No. 22), to which Defendants filed a response in opposition (Docket Entry No. 27), and Plaintiff's Motion and Memorandum to Strike Defendants' Reply and Declaration of Scott Perkins (Docket Entry No. 28), to which Defendants filed a response in opposition (Docket Entry No. 29).

Plaintiff is a former armored service technician ("AST") for Loomis who claims that his employment was wrongfully terminated because he complained about not receiving overtime pay. He filed suit against Defendants alleging a retaliation claim under the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 et seq., and state-law claims for false imprisonment and malicious prosecution. Defendants allege that Plaintiff's employment was terminated because he engaged in theft and violated company policy in the course of his job duties, Plaintiff cannot establish a *prima*

1

*facie* case of FLSA retaliation or show that Defendants' proffered reason for the termination was a pretext for retaliation, and Plaintiff cannot satisfy the elements of his state-law claims.

## I. FACTS

Loomis is a Texas corporation engaged in the armored transport and automated teller machine ("ATM") replenishment business in interstate commerce. Loomis' operations in Middle Tennessee are managed by Tommy Turbeville, Area General Manager. Some of the routes that are serviced from the Nashville branch cross the state line into Kentucky six (6) days of the week, and all ASTs, including Plaintiff, were subject to being assigned to cover those routes.

Plaintiff began working as an AST for Loomis at the Nashville branch on June 5, 2000. He was responsible for accessing ATMs and replenishing currency in them. ASTs are assigned to a truck and route with one other AST. In late winter to early spring of 2007, Plaintiff's partner was ordinarily Catherine Smith ("Smith"). Plaintiff and Smith alternated duties as the driver and the messenger. Normally, for the duration of the route, the driver drives the truck and is not allowed to leave the truck, while the messenger handles the cash.

The cash used to replenish ATMs is placed in individual tamper-proof bags by Loomis's Cash Management Services department ("CMS") the day before the bags are to be taken from the Loomis vault by the ASTs. Each bag contains a service order which notes the denominations of the cash and the amount of each denomination contained in the bag.

The messenger's first step in preparing to run a route is to retrieve from Loomis' vault the pre-filled, tamper-proof cash bags for the ATMs on the route. The money is then transported in the truck to the ATMs on the route. The messenger accesses the ATM's computer, prints receipts from the ATM, and enters into the computer the new totals of money with which he or she is replenishing

2

the ATM. Then the messenger opens the vault in the ATM with a specially encrypted ATM R key and number combination, removes all of the cash left in the ATM since its last service, places that cash in a tamper-proof bag, seals the bag, replenishes the ATM with the cash from the new pre-filled cash bag, and then closes and locks the vault. The messenger signs the service order to show that he or she serviced the machine. The cash removed from the ATM is placed in the back of the truck and is transported to CMS where it is checked in by the messenger at the end of the route. The cash is then counted by CMS employees to verify that the amount returned by the messenger balances with the ATM receipts showing the amount of money that the messenger should have removed from the ATM.

Gill is employed by Loomis as an Area Loss Prevention Manager for Middle and East Tennessee. He is a former police officer and reports directly to Turbeville. In the course of his employment, he reviews "difference reports" every four to six weeks. The reports reflect either money shortages or overages from ATMs, and identify the AST who serviced the ATM at the time of the money shortages or overages. Gill looks for large money shortages or overages and for trends, such as repeated shortages of the same amount of money. Such trends raise suspicion of theft and when such trends are identified, he investigates those further to determine the cause.

In March 2007, while reviewing difference reports for each Middle Tennessee-based agent that had a shortage or overage, Gill noticed a trend for several of the ATMs serviced by Plaintiff and Smith dating back to February 2007. The cash attributed to each of the ATMs in question in the difference report was short $80. In total, the report reflected that on at least twelve (12) occasions in February and March 2007, Bank of America ATMs serviced by Plaintiff were short $80. Gill also noted that three (3) of the shortages occurred on days Plaintiff worked with a partner other than

3

Smith. The report revealed no other agents with similar shortage trends. Gill reported his observations to Turbeville, who directed Gill to begin an investigation into whether Plaintiff and Smith were stealing.

Gill's job duties included making sure that employees were not stealing from Loomis. Plaintiff agreed that part of Gill's job description was to conduct audits. Gill testified at his deposition that he conducted a total of four audits on ATMs serviced by Plaintiff, following the same steps in each instance. The first audit occurred on April 16, 2007, for a Bank of America ATM located at 17th and Church Street, designated as STN0275. The second audit occurred on April 17, 2007 for a Bank of America ATM located at Harding Road, designated as STN7486. The third audit occurred on April 23, 2007, again for the ATM at 17th and Church Street, and the fourth audit occurred on April 24, 2007, again for the Harding Road ATM. All audits were performed under dual control, so that two people in management were present at every stage of the audit to ensure integrity.

Plaintiff challenges the number of audits Gill actually performed. In swearing out an arrest warrant against Plaintiff on April 26, 2007, Gill represented that he conducted surveillance of Plaintiff twice, on April 16 and 17, 2007, and audited 18 ATMs that Plaintiff serviced. At the preliminary hearing in the criminal case, Gill testified that he conducted surveillance of Plaintiff three times, on April 16, 17 and 25, 2007, and that he audited three ATMs. At his deposition in this case, Gill testified he conducted four audits on two ATMs.

Even giving Plaintiff the benefit of the doubt that Gill provided different testimony under oath at different times and that his credibility would be subject to impeachment at a trial, Plaintiff does not dispute that Gill conducted at least two audits of ATMs Plaintiff serviced and that each of

4

them revealed $80 missing. The dispute over the number of audits actually conducted is not a genuine issue of material fact that affects the Court's ultimate legal analysis in the case.

The first step in Gill's audit was to visit CMS to verify the amount of cash contained in the pre-filled cash bag Plaintiff would check out the next day for the particular ATM under audit. Gill and Plaintiff's supervisor, Steve Cota, who also reports directly to Turbeville, verified under dual control that the amount of cash in the bag was the same as the amount noted on the service order. Gill opened the bag and counted the cash with a bill counter, a device which can quickly and accurately count cash. The cash in the bag matched the amount entered on the service order. Gill then placed the cash in a new tamper-proof bag, sealed it, and returned it to the vault to be checked out by Plaintiff the following day.

The next step in the audit occurred the next day and involved verifying the amount of cash remaining in the ATM shortly before Plaintiff was scheduled to service the ATM. Gill and John Witherspoon, Operations Supervisor, drove to the ATM, opened it, and pulled a receipt from the ATM. The receipt showed the amount of currency the ATM started with, how much it had dispensed, how much went into the divert tray (money that the machine could not dispense for some reason) and the ending balance. (Docket Entry No. 23-8, Gill Depo. at 160.) Gill and Witherspoon used a bill counter to count the cash in the ATM and verified that the cash matched the balance on the ATM receipt.

Gill and Witherspoon then parked in an adjacent parking lot and watched as Plaintiff and Smith arrived and Plaintiff serviced the ATM. After Plaintiff and Smith left the premises, Gill and Witherspoon immediately shut down the ATM and repeated the same cash verification process they

5

used just prior to the servicing. They verified that the amount of cash Plaintiff placed into the ATM was, in fact, the amount stated on the service order.

Gill directed CMS to count under dual control the cash Plaintiff returned to CMS at the end of his shift for each ATM under audit. CMS supervisor Richard Stewart and either his supervisor, CMS Manager Heather Schmidt, or his fellow CMS supervisor, Shea Watson, counted the cash. In each instance, the cash Plaintiff returned for the audited ATM was short $80. Similarly, Gill conducted audits of ATMs that were serviced by Smith as messenger. Those audits also revealed $80 shortages from the cash Smith returned to CMS.

Gill knows there are ways an ATM could be short other than theft. The ATM could fail to dispense currency properly or money could be left in the divert tray or the cassette by the messenger. Similarly, it is not uncommon for ATMs to contain more money than they should. Based on his investigation, however, Gill concluded that, on at least eighteen (18) occasions, there were shortages of $80 in the ATMs serviced by Plaintiff.

On April 25, 2007, at the end of the shift, Gill and Cota together spoke with Plaintiff and Smith individually to ask them to explain the $80 discrepancies. Gill told Plaintiff he could not leave the room and he could not use the telephone.

Plaintiff denied taking any money. He admitted that he loaned his ATM R key to Smith. His written statement said: "We have used each other[']s key to open safe to do the replenishment and deposit pulls[,] also some time in the begin[n]ing of the year Cathy did not have a key[,] hers was not working so I let her use mine while hers was being ordered. I am not sure of the date of this[;] I think it was this year!" (Docket Entry No. 16-5.) Although Plaintiff testified at his deposition that his written statement was accurate, he also insisted that he loaned his ATM R key

6

to Smith only once when hers was not working and only after Witherspoon was contacted and gave permission for Plaintiff to loan his ATM R key to Smith. After Witherspoon granted his permission, Smith used Plaintiff's ATM R key to complete the rest of their servicing route that day.

Plaintiff alleges that Gill testified he subsequently asked Witherspoon whether he had given Smith permission to use Plaintiff's ATM R key and Witherspoon responded that he had not. In contrast, Witherspoon testified that Gill did not ask him if he gave Smith permission to use Plaintiff's ATM R key. The Court finds that this factual dispute is not material because the Court assumes that Witherspoon gave Smith permission to use Plaintiff's ATM R key on one day. Plaintiff's written statement, however, which he testified is accurate, indicates that Plaintiff and Smith used each other's keys on other days, apparently without permission.

At the conclusion of the interviews, Gill did not physically search Plaintiff or Smith to try to locate stolen currency, and he did not arrange for Plaintiff to take a polygraph examination, as Plaintiff requested. Gill testified that post-employment polygraph examinations are not used at Loomis, although Plaintiff was required to take a polygraph at the time of his hiring.

Smith admitted to Gill and Cota that she had taken $80 on approximately ten (10) occasions. She provided Gill with a written statement to that effect, but she recanted the next day and provided Gill with a different written statement denying any theft and explaining that her first statement was given under duress.

Gill believed that Plaintiff and Smith had stolen money from Loomis, $80 at a time. He reported the results of his investigation to Turbeville with a recommendation for employment termination. Gill also contacted the Metro Police Department and verbally described the results of his investigation to Detective Kelly White. Gill then swore out a criminal affidavit for theft of

7

property against Plaintiff and Smith. Gill called Plaintiff at home on April 25, 2007, to ask him to talk to Detective White the next day, either with or without Gill present. Plaintiff replied that he would be busy the following day, but he would visit Detective White on April 27, 2007, and Gill agreed. On April 27, Detective White booked Plaintiff on the felony theft charge and put him in jail for about two hours until he posted bond.

Gill testified at Plaintiff's preliminary hearing in the criminal case and before the Davidson County grand jury. The grand jury indicted Plaintiff for felony theft based upon Gill's testimony. The criminal case is still pending and has not been decided on the merits in Plaintiff's favor.

Loomis' written policy provides that the employment of an employee who commits theft will be terminated, without exception. In addition, in every such case, Loomis policy provides that the information relied upon to reach the conclusion that an employee engaged in theft will be turned over to local law enforcement officials for prosecution. Of the investigations of suspected employee theft Gill has conducted while at Loomis, six involved the Nashville branch and resulted in findings of theft by employees. In each case, Gill provided his findings to local law enforcement officials, the employees were criminally prosecuted, and the employees' employment with Loomis was terminated.

Plaintiff testified that he understood Loomis expected him to be honest during his employment and that he was not supposed to lie, cheat or steal or act as an accomplice to any dishonesty while employed by Loomis. He understood he was not to share his ATM R key with anyone or loan it to anyone for accountability reasons. He knew that stealing was grounds for termination and theft would be prosecuted.

8

Turbeville made the decision to terminate Plaintiff's employment in collaboration with the Human Resources Director at the Nashville branch, Kathi Lee, and with the approval of the Director of Human Resources for the Southern Region, Mark Foster. Plaintiff was discharged for theft and violating company policy.

Prior to these events, in late 2006 and early 2007, Plaintiff allegedly complained to his supervisors, Cota and Turbeville, about the lack of overtime pay for ASTs. On average Plaintiff worked nine to ten hours a day and sometimes as long as thirteen hours a day. He thought he was legally entitled to overtime pay because the posters on the wall at his place of employment said so. Defendants claim Plaintiff was exempt from the overtime requirements of the FLSA because he was subject to the motor carriers exemption. A driver is exempt from the FLSA if the driver actually engages in interstate transportation, or is subject to being called on to engage in interstate transportation. 29 C.F.R. § 782.2(a), (b)(3).

Plaintiff testified that, before he began complaining about Loomis' pay practices, Cota had been a fair manager. After Plaintiff began to complain about overtime pay, Cota's demeanor changed and he became very short with Plaintiff. Cota yelled and screamed at Plaintiff. He told Plaintiff that he could not change Loomis' overtime pay practices, and if he did not like it he should turn in his keys and quit. Plaintiff told Cota he would not quit.

Beginning in late 2006, Plaintiff also complained several times to Turbeville about overtime, but this was a "sore spot," and each time Turbeville told Plaintiff that if he was not happy at Loomis he should just leave and find another job elsewhere. Plaintiff told Turbeville that he would not quit.

Plaintiff testified that, almost immediately after he began complaining about overtime pay in late 2006, Turbeville, Cota and Gill began calling him derogatory names like "Shrek" and

9

"retard." Plaintiff also testified that Gill said if he were still a cop in Florida, he would have Plaintiff arrested, and Gill told Plaintiff's co-workers not to listen "to the retard." Smith testified, however, that management employees and co-workers started calling Plaintiff "Shrek" several years earlier after he shaved his head bald. Gill testified that he and Plaintiff called each other names and they were joking around. Witherspoon testified that the name "Shrek" did not appear to bother Plaintiff.

At the time of Plaintiff's employment termination, neither Mark Foster nor Kathi Lee, the Human Resources Directors, were aware that Plaintiff had complained about Loomis' overtime pay practices. Plaintiff could not recall discussing his overtime complaints with Gill. However, Plaintiff claimed Gill knew about Plaintiff's overtime concerns because Plaintiff complained at safety meetings that Gill normally would have attended, although Plaintiff could not say for certain that he recalled Gill in attendance at the safety meetings when he complained.

In late January 2007, Turbeville held a mandatory branch meeting. During the meeting, Smith stood up and confronted Turbeville about raises and overtime pay. Turbeville got "pretty mad" and told Smith repeatedly to zip her mouth and sit down. Plaintiff did not raise any complaints or questions during the meeting. Plaintiff contends he and Smith were the only employees who spoke out about overtime, but Turbeville attests that other employees made internal complaints and inquiries about overtime pay and their employment was not terminated.[1]

---

[1]Turbeville gave as one example employee Robert Karpinecz, who complained about overtime but was not discharged from employment.

Defendants provided the Declaration of Karpinecz (Docket Entry No. 16-14) in support of their summary judgment motion. Karpinecz attests that he has been employed by Loomis in Nashville for thirteen (13) years, he has raised questions and complaints about overtime pay with members of management, and he does not believe he has been subjected to any type of retribution specifically because of his complaints or questions.

Plaintiff moves to strike (Docket Entry No. 22) the Karpinecz declaration on the ground that
(continued...)

10

Plaintiff denies that he stole any money from Loomis. He contends there are factual disputes, other than those the Court has already mentioned, which preclude the entry of summary judgment for Defendants.

For example, Plaintiff does not dispute that the selected pages of difference reports he received in discovery show $80 shorts, but he claims it is impossible to tell from the limited information he received whether the trend Gill claims to have seen in the reports was in fact unique without looking at complete "difference report by agent" reports for other agents at the same time. He also claims it is impossible to tell how much currency remained in each audited ATM without reviewing ATM service orders from the previous occasion when the ATM was opened and serviced.

Plaintiff states he requested all difference reports by agent for all technicians for the period from January 1, 2007 through July 1, 2007, but Defendants responded that they are no longer in possession of any reports other than the few pages produced. He also claims that, although Defendants produced hundreds of pages of ATM service orders, each service order for the service immediately prior to and after Gill's audits were not produced. Defendants agree they did not provide the ATM service orders for the service events immediately prior to and after the audits because they were not in Defendants' possession. However, Defendants provided Plaintiff with

---

[1](...continued)
Defendants did not disclose the witness during discovery. Defendants concede they failed to disclose Karpinecz's name, but they contend his declaration should not be stricken because Turbeville was disclosed as a witness, and Karpinecz was identified in Turbeville's declaration.
   The Court grants Plaintiff's motion to strike the Karpinecz declaration. Defendants did not comply with the Federal Rules of Civil Procedure in disclosing the name and potential testimony of this witness.

11

documents reflecting how much money was in each ATM to start and how much money should have been in the ATM at the time of the audit.

The lack of difference reports by agent for all technicians and the lack of ATM service orders does not create a *material* factual dispute to preclude summary judgment. Gill noticed a trend that Plaintiff's ATMs were repeatedly short $80. Whether this trend was unique as compared to other ASTs is immaterial in light of the subsequent, specific ATM audits that showed shortages of $80 after Plaintiff serviced the ATMs and returned cash to CMS.

The lack of service orders for the service immediately prior to Gill's audits does not affect the material facts. During the audit, Gill and Witherspoon counted the money in each ATM just before Plaintiff serviced the ATM. In each case, the amount of money actually in the ATM matched the receipt the ATM computer printed out at that time showing how much money should be in the machine. Plaintiff then serviced the machine by removing all of the money from the ATM and replacing it with the contents of the new tamper-proof bag. The cash Plaintiff returned from the serviced ATMs to CMS turned up $80 short. Thus, Gill and Witherspoon deduced that Plaintiff took $80 from each ATM between the time he removed all of the cash from the ATM and the time he returned cash to CMS because it was at that point that re-counting revealed each $80 loss. How much cash was originally placed in the ATM at the prior servicing is immaterial.[2]

Plaintiff also contends that Gill did not try to obtain video recordings from ATM cameras which would have shown that Plaintiff did not steal any money. Plaintiff alleges that Gill testified

---

[2]If Plaintiff believed that Defendants did not turn over all discovery material subject to his discovery requests, Plaintiff should have filed a motion to compel discovery before the Magistrate Judge in an effort to obtain such discovery. The docket sheet does not show that Plaintiff ever filed a motion to compel.

12

untruthfully at the preliminary hearing in the criminal case concerning the whereabouts of the ATM video recordings, when in fact he knew or should have known that at least some of the videos were stored in a closet near his office.

Again, information that Gill may have testified falsely in an earlier proceeding might be fodder for cross-examination if there were a trial in this case. Defendants do not agree that the camera on every ATM could have captured video of Plaintiff as he opened the vault at the side or back of an ATM. The camera would have captured only what occurred in front of the ATM and nothing else that occurred around the ATM or inside the armored truck.[3]

Although the Court acknowledges that there is a factual dispute about what the ATM cameras would have shown, the Court finds the dispute is not material. The audits showed that Gill and Witherspoon counted the money in an ATM before Plaintiff serviced it, they conducted surveillance while Plaintiff serviced the ATM, and they shut down the ATM and immediately re-counted the money in the ATM after Plaintiff completed the servicing. The $80 turned up missing from the cash Plaintiff returned to CMS. Thus, the ATM camera view and recording are not material to the issues before the Court because no one besides Plaintiff, Gill and Witherspoon had

---

[3]Defendants point out in a reply brief and rebuttal declaration that Gill tried to locate ATM video recordings from Bank of America by contacting Vice President for Security, Scott Perkins, after Plaintiff's criminal attorney requested copies of the videos. Plaintiff moves to strike Defendants' reply and the Perkins declaration because they were untimely filed and Plaintiff did not have an opportunity to respond to the substance of the Perkins declaration. Plaintiff's motion to strike will be granted.

Under the Initial Case Management Order entered on June 16, 2008 (Docket Entry No. 11, Order ¶ 9), Defendants' reply was due on April 10, 2009, but the reply brief and the Perkins declaration were filed ten days late on April 20, 2009, without an accompanying motion for leave to file the documents out of time. Accordingly, the Court will grant the motion to strike and the Court will not rely on those two documents.

13

access to the cash in the audited ATMs. In the criminal case the State must prove beyond a reasonable doubt that Plaintiff stole money from the ATMs he serviced. In this case, the Court is concerned only with the FLSA retaliation claim and two state-law tort claims, and for the reasons stated below, Plaintiff's claims fail as a matter of law.

## II. STANDARD OF REVIEW

A party may obtain summary judgment if the evidence establishes there are not any genuine issues of material fact for trial and the moving party is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56(c); Covington v. Knox County School Sys., 205 F.3d 912, 914 (6th Cir. 2000). The moving party bears the initial burden of satisfying the court that the standards of Rule 56 have been met. See Martin v. Kelley, 803 F.2d 236, 239 n.4 (6th Cir. 1986). The ultimate question to be addressed is whether there exists any genuine issue of material fact that is disputed. See Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986); Covington, 205 F.3d at 914 (citing Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986)). If so, summary judgment is inappropriate.

To defeat a properly supported motion for summary judgment, the nonmoving party must set forth specific facts showing that there is a genuine issue of material fact for trial. If the party does not so respond, summary judgment will be entered if appropriate. Fed. R. Civ. P. 56(e). The nonmoving party's burden of providing specific facts demonstrating that there remains a genuine issue of material fact for trial is triggered once the moving party shows an absence of evidence to support the nonmoving party's case. Celotex, 477 U.S. at 325. A genuine issue exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248. In ruling on a motion for summary judgment, the Court must construe the evidence

14

in the light most favorable to the nonmoving party, drawing all justifiable inferences in its favor. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

### III. APPLICATION OF LAW

The FLSA contains an anti-retaliation clause which makes it unlawful "to discharge or in any other manner discriminate against any employee because such employee has filed any complaint or instituted or caused to be instituted any proceeding under or related to this chapter[.]" 29 U.S.C. § 215(a)(3). The burden-shifting analysis of McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973) applies to such a retaliation claim. Adair v. Charter Co. of Wayne, 452 F.3d 482, 489 (6th Cir. 2006).

To establish a *prima facie* case of retaliation, the employee must prove that (1) he engaged in a protected activity under the FLSA; (2) his exercise of the right was known by the employer; (3) thereafter, the employer took an employment action adverse to him; and (4) there was a causal connection between the protected activity and the adverse employment action. Adair, 452 F.3d at 489. If the employee establishes a *prima facie* case, a presumption arises that the employer unlawfully retaliated against the employee. Id. The burden then shifts to the defendant to produce evidence of a legitimate, non-discriminatory reason for the adverse employment action. Id. If the defendant carries the burden, the plaintiff must then prove by a preponderance of the evidence that the defendant's proffered reasons were not its true reasons, but merely a pretext for illegal retaliation. Id.

Defendants dispute that Plaintiff engaged in protected activity under the FLSA, but for purposes of summary judgment they agree the Court can assume that the first element of the *prima facie* case has been met. There is no dispute that Plaintiff has shown an adverse employment action

15

to satisfy the third element. Defendants contend that Plaintiff cannot establish the second and fourth elements of his *prima facie* case.

The second element concerns the Defendants' knowledge that Plaintiff engaged in protective activity. Plaintiff's evidence is slim on what Defendant Gill knew about Plaintiff's complaints concerning overtime pay. Plaintiff testified he complained at safety meetings at which Gill should have been in attendance, but Plaintiff could not recall for certain that Gill attended those meetings to hear his complaints. At the mandatory branch meeting held at the end of January 2007, Plaintiff's partner, Smith, confronted Turbeville about overtime pay, and Gill was present to hear Smith's comments, but Plaintiff did not speak at that meeting. Gill denied that he knew anything about Plaintiff's complaints concerning overtime pay. The very limited evidence Plaintiff produced is not enough to show that Gill knew about Plaintiff's overtime complaints. See Anderson, 477 U.S. at 248 ("The mere existence of a scintilla of evidence in support of the plaintiff's position is insufficient; there must be evidence on which the jury could reasonably find for the plaintiff.")

The decision to terminate Plaintiff's employment was made by Turbeville, Kathi Lee, and Mark Foster. Plaintiff produced no evidence to contradict Lee's and Foster's attestations that they knew nothing about Plaintiff's complaints relating to overtime before they participated in the decision to terminate his employment. The Court concludes that Plaintiff did present sufficient evidence to show that Turbeville knew Plaintiff had complained directly to him about overtime pay. Because Turbeville was Area General Manager and acted as an agent for Loomis, the Court concludes that Plaintiff satisfies the second element that Loomis had knowledge of Plaintiff's protected activity.

16

The fourth element requires Plaintiff to draw a causal connection between his protected activity and his employment termination. To demonstrate a causal connection, the Plaintiff must produce sufficient evidence from which an inference can be drawn that his firing would not have occurred had he not complained about overtime pay. Adair, 452 F.3d at 490. Although no one factor is dispositive in showing a causal connection, evidence that the Defendants treated the Plaintiff differently from identically situated employees or that the adverse action was taken shortly after the Plaintiff's exercise of protected rights is relevant to causation. Id. "However, that the actions complained of followed the protected activity closely in time, standing alone, is insufficient to establish the causation element of a retaliation claim." Id. at 490-491.

There is no evidence that Plaintiff complained about overtime pay after late 2006. Smith was the one who complained at the mandatory meeting in late January 2007, and Plaintiff did not produce evidence of any other time when he complained to Turbeville in 2007. Thus, approximately four months passed between Plaintiff's last complaints to Turbeville in December 2006 and his discharge in late April 2007. Sixth Circuit cases hold that a span of four months or more between protected activity and adverse action, without some additional compelling evidence of retaliation, is insufficient to establish the required causal connection. See Imwalle v. Reliance Med. Prods., Inc., 515 F.3d 531, 550 (6th Cir. 2008); Cooper v. City of North Olmsted, 795 F.2d 1265, 1272 (6th Cir. 1986). Moreover, the record indicates that Defendants treated alike all employees who were caught stealing or sharing ATM R keys–they were fired and theft cases were turned over for prosecution. Other than the timing of events, the Plaintiff produces only allegations that Turbeville, Cota and Gill called him names like "Shrek" and "retard" after he complained; Gill told Plaintiff if he was still a cop in Florida he would have Plaintiff arrested; and Gill told Plaintiff's co-

17

workers not to listen to the "retard." Assuming the name-calling started in early 2007 and not years earlier as Smith testified; that the name-calling was done maliciously and not in jest; and that Plaintiff was bothered by the name-calling, Plaintiff still has not shown any link between the name-calling and his discharge in late April. The Court concludes that Plaintiff has not established a *prima facie* case of retaliation against the Defendants because the fourth element of a causal connection is not satisfied. Even assuming that Plaintiff established a *prima facie* case against Loomis and Gill, however, Defendants produced evidence of a legitimate, nondiscriminatory reason for terminating Plaintiff's employment–his theft of money placed under his care and control in the scope of his employment and his violation of company policies concerning thievery and sharing of ATM R keys. Defendants are not required to prove that Plaintiff "actually committed the alleged theft or show that [their] investigation was perfect; [they] need only show that [they] decided to report [Plaintiff] to the police 'based on an honestly held belief in a nondiscriminatory reason supported by particularized facts after a reasonably thorough investigation.'" Graham v. Best Buy Stores, L.P., 298 Fed.Appx. 487, 496 (6th Cir. 2008) (quoting Wright v. Murray Guard, Inc., 455 F.3d 702, 709 (6th Cir. 2006)). Defendants met the burden to show that they referred Plaintiff's case to the police and terminated his employment on the honest belief after a reasonably thorough investigation that he committed felony theft and violated company policies.

To create a genuine issue of material fact as to pretext in order to defeat the summary judgment motion on the retaliation claim, Plaintiff must show that Defendants' proffered reasons had no factual basis, the proffered reasons did not actually motivate the Defendants' actions, or the proffered reasons were insufficient to motivate the actions. Adair, 452 F.3d at 491. Plaintiff contends that he can show pretext because Defendants had access to ATM video that would have

18

shown Plaintiff did not steal the money, but they made no effort to obtain the video; Gill testified untruthfully about where the ATM video was held and about the number of his ATM audits; Gill did not try to search Plaintiff to locate stolen money; Gill refused to give Plaintiff a polygraph examination; Plaintiff loaned his ATM R key to Smith on only one occasion with permission; and Defendants failed to disclose important documents requested in discovery.

The Court previously explained why most of these alleged factual issues are not material disputes. Further, these issues cannot establish that Defendants' proffered reasons for the discharge were without any factual basis, that the proffered reasons did not actually motivate the Defendants' actions, or that the proffered reasons were insufficient to motivate the Defendants' actions. Adair, 452 F.3d at 491. Without sufficient evidence of pretext, the Court concludes that Defendants are entitled to summary judgment on the FLSA retaliation claim.

False imprisonment is the intentional restraint or detention of another person without just cause. Newsom v. Thalhimer Bros., Inc., 901 S.W.2d 365, 367 (Tenn. Ct. App. 1994). The elements of the tort of false imprisonment are: (1) the detention or restraint of one against his will and (2) the unlawfulness of such detention or restraint. To prove the tort of malicious prosecution, the Plaintiff must prove that (1) a prior suit or judicial proceeding was instituted without probable cause; (2) Defendants brought the prior action with malice, and (3) the prior action was finally terminated in Plaintiffs' favor. Roberts v. Federal Exp. Corp., 842 S.W.2d 246, 248 (Tenn. 1992).

As to false imprisonment, Plaintiff was held in jail for two hours after his booking on the felony charge of theft. However, the evidence shows there was probable cause to support the initial criminal charge and the subsequent grand jury indictment established probable cause to proceed criminally against Plaintiff for theft. Probable cause is established where facts and circumstances

19

are sufficient to lead an ordinarily prudent person to believe the accused is guilty of the crime charged. Id. Defendants' evidence of probable cause undercuts both of these tort claims. Further, the malicious prosecution claim fails because the criminal case has not been finally terminated in Plaintiffs' favor. Plaintiff has not created sufficient and genuine issues of material fact for trial on these state-law claims to proceed to trial.

## IV. CONCLUSION

For all of the reasons stated, the Defendants are entitled to summary judgment on Plaintiffs' federal and state claims. Plaintiff has not met his *prima facie* burden on the FLSA retaliation claim, but even if he has, he has not shown that Defendants' stated reasons for terminating his employment were a pretext for retaliation. Plaintiffs' state-law tort claims for false imprisonment and malicious prosecution also falter because Defendants showed there was probable cause to arrest Plaintiff and hold him in jail a short time until he posted bond. The criminal case has not been resolved in Plaintiff's favor, so the third element of malicious prosecution is not met.

Plaintiff's Motion and Memorandum to Strike the Declaration of Robert Karpinecz (Docket Entry No. 22) will be granted. Plaintiff's Motion and Memorandum to Strike Defendants' Reply and Declaration of Scott Perkins (Docket Entry No. 28) will be granted. Defendant Loomis Armored Us, Inc.'s and Defendant Jim Gill's Motion For Summary Judgment (Docket Entry No. 16) will be granted, and this case will be dismissed with prejudice.

An appropriate Order will be entered.

                                              ROBERT L. ECHOLS
                                              UNITED STATES DISTRICT JUDGE